UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| SUPERNOVA SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:10-CV-319 |
| ) | |
| GREAT AMERICAN BROADBAND, INC., ) | |
| ROBERT L. SCHMIDT, and ) | |
| SUBODH NAYAR, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

**I.  INTRODUCTION**

This dispute arises out of a Stock Purchase Agreement entered into between Plaintiff Supernova Systems, Inc. ("Supernova"), and Defendant Great American Broadband, Inc. ("GAB"), on July 10, 2008, whereby GAB purchased all of the shares of Supernova's five subsidiaries and, in exchange, issued Supernova 53,350 shares of GAB, together with cash and a promissory note.  Supernova alleges in this suit that GAB and its two officers, Robert Schmidt and Subodh Nayar, violated the registration requirements and anti-fraud provisions of the Indiana Uniform Securities Act (the "IUSA") when it offered and sold shares of GAB to Supernova as part of the transaction.[1]

GAB now moves for summary judgment, asserting that the transaction was "exempt" from the IUSA's registration requirements and, accordingly, that it is entitled to judgment as a

---

[1] The IUSA, formerly Indiana Code § 23-2-1 *et seq.*, was amended and recodified by Indiana Public Law 27-2007, effective July 1, 2008, at Indiana Code § 23-19-1 *et seq. See West v. State*, 942 N.E.2d 862, 863 n.1 (Ind. Ct. App. 2011).  The parties agree that, pursuant to Indiana Code § 23-19-1-0.2, the predecessor act applies to this dispute.

matter of law on Count I of Supernova's complaint. (Docket # 53.) For the following reasons, GAB's motion will be GRANTED.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

Supernova is an Indiana corporation located in Bluffton, Indiana. (Miller Aff. ¶ 3; Compl. Ex. C ¶ 11.13.) Through its five wholly-owned subsidiaries, Supernova was engaged in the business of providing wireless internet access in small towns and rural areas, primarily in Indiana.[3] (Miller Aff. ¶¶ 4, 38.) Supernova had four shareholders: Rick Harnish, Terry Miller and his wife Debbie, and Larry Roth. (Miller Aff. ¶ 6, Ex. D.) Harnish owned 45% of Supernova's shares and was an officer and director of Supernova and each of its subsidiaries. (Miller Aff. ¶ 5.) Miller, together with his wife, also owned 45% of Supernova's shares; he, like Harnish, was an officer and director of Supernova and each of its subsidiaries. (Miller Aff. ¶¶ 2, 6, 8.) Roth, who owned 10% of Supernova's shares, was a full-time employee of Supernova, but did not serve as an officer or director of Supernova or any of its subsidiaries. (Miller Aff. ¶¶ 6, 7, 22.)

GAB is a Delaware corporation formed in 2007. (Schmidt Aff. ¶ 3; Compl. Ex. C.) Its business plan was to create an integrated WISP by consolidating the operations of existing WISPs in rural communities throughout the United States. (Schmidt Aff. ¶ 3; Miller Aff. Ex. B.) Schmidt was GAB's chief executive officer and chairman of its board of directors; Nayar served as GAB's president and chief operating officer; and Attorney Steve Coran was GAB's "outside

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Supernova, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[3] Supernova was what is commonly known as a "WISP," that is, a wireless internet service provider. (Miller Aff. ¶ 4.)

counsel." (Schmidt Aff. ¶ 2; Miller Aff. ¶ 14, Ex. B.)

In 2007, Schmidt of GAB met Harnish of Supernova through a trade group for WISPs, and Schmidt told Harnish that GAB was attempting to acquire local WISPs. (Schmidt Aff. ¶ 4.) By mid-summer of that year, GAB and Supernova, after entering into a non-disclosure agreement, began to discuss a possible transaction in which GAB would acquire the WISP operation of Supernova. (Miller Aff. ¶ 13; Schmidt Aff. ¶ 6.) In September 2007, Miller identified Supernova's four shareholders in an e-mail to Nayar, GAB's president, copying Schmidt on the communication. (Miller Aff. ¶ 21, Ex. D.)

In October 2007, GAB sent a letter of intent to Supernova, which it did not accept. (Miller Aff. ¶ 23, Ex. E.) The next month, GAB sent a second letter of intent, which Supernova accepted. (Miller Aff. ¶ 24, Ex. F.) This letter outlined a proposed transaction in which GAB would acquire all of the stock of Supernova for a price of $3,000,000, of which $2,160,000 would be paid by issuing shares of GAB stock to Supernova.[4] (Miller Aff. ¶ 24, Ex. F; Schmidt Aff. ¶ 12.) The value of the shares was based upon GAB's recent acquisition of two WISPs and recent negotiations for shares of GAB stock. (Schmidt Aff. ¶ 12.) Schmidt explained to Supernova and Miller the basis for GAB's valuation of the shares on numerous occasions; no one from Supernova disputed the valuation. (Schmidt Aff. ¶ 12.)

Throughout the parties' negotiations, Supernova conducted due diligence of GAB (Schmidt Aff. ¶ 9), and the parties had "extensive exchanges of information" (Miller Aff. ¶ 12). Nevertheless, GAB never inquired about Roth's personal net worth or annual income. (Miller

---

[4] Apparently, from the beginning of the parties' discussions, Supernova refused to structure the transaction as an asset purchase, and thus the negotiations focused on an exchange of stock and cash. (Schmidt Aff. ¶ 8.)

Aff. ¶¶ 37, 39, 40; Roth Aff. ¶¶ 7-9.)

In April 2008, Miller, concerned about adverse tax consequences to the Supernova shareholders, proposed that the transaction instead be structured as a purchase by GAB of all the stock that Supernova owned in its five subsidiaries. (Miller Aff. ¶¶ 26-28, Ex. H.)  GAB accepted Miller's proposal. (Miller Aff. ¶ 30, Ex. I.)  Supernova's attorney drafted a stock purchase agreement and sent it to Attorney Coran, who then assumed responsibility for drafting the Stock Purchase Agreement for the transaction. (Miller Suppl. Aff. ¶¶ 4, 5.)  Attorney Coran sent his draft Stock Purchase Agreement to Miller in May 2008, and on July 9, 2008, Coran circulated the "final" form of the Agreement, which the parties executed the next day. (Miller Aff. ¶¶ 35, 36, Exs. L, M; Compl. Ex. C.)  As contemplated by the letter of intent, under the Stock Purchase Agreement GAB acquired the stock of the five Supernova subsidiaries for a purchase price of $3,000,000, of which $2,160,000 was paid by GAB issuing 53,350 shares of GAB stock to Supernova.[5] (Miller Aff. ¶ 38; Schmidt Aff. ¶ 12; Compl. Ex. C.)

In the Agreement, Supernova made various representations and warranties to GAB concerning its purchase of the GAB stock, including that (1) it was purchasing the stock entirely for its own account; (2) it had an opportunity to discuss GAB's business management and financial affairs with GAB's management; (3) it understood that the shares had not been registered under the Securities Act; (4) there is no public market for the shares; and (5) the stock certificate would bear certain legends. (*See* Compl. Ex. C ¶¶ 4.22-4.27.)  The instant dispute centers on the following representation and warranty made by Supernova:

---

[5] Supernova explained to GAB in an April 2008 email that after the transfer of all the stock in its subsidiaries, Supernova would have only a few assets remaining, all of little value. (Miller Aff. ¶¶ 31, 32.)

**4.27    Accredited Investor.**

[Supernova] is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(Compl. Ex. C ¶ 4.28.)

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id*. at 771.

### IV.  DISCUSSION

In Count I of its complaint, Supernova contends that GAB violated the IUSA by failing to register the shares of GAB's common stock that it provided to Supernova in exchange for its purchase of all of the stock of Supernova's subsidiaries. *See* IND. CODE § 23-2-1-3 (making it unlawful to offer or sell any security in Indiana unless it is registered, the security or transaction

5

is exempted, or it is a federal covered security). GAB admits that it sold unregistered stock to Supernova (Fletcher Aff. Ex. A), but asserts that the stock sale was lawful because it fell under the "private placement" exemption of the IUSA, IND. CODE § 23-2-1-2(b)(10). Accordingly, GAB contends it is entitled to judgment as a matter of law on Count I of Supernova's complaint.

The parties agree that Defendants' summary judgment motion requires interpretation of the IUSA, which is an issue of law. *See Sec. Trust Corp. v. Estate of Fisher ex. rel. Roy*, 797 N.E.2d 789, 792 (Ind. Ct. App. 2003) (articulating that interpretation of a defined term in the IUSA is a question of law for the courts). Indeed, "[w]here as here, the relevant facts are not in dispute and the interpretation of a statute is at issue, such statutory interpretation presents a pure question of law for which summary judgment disposition is particularly appropriate." *Fort Wayne Patrolmen's Benevolent Ass'n, Inc. v. City of Fort Wayne*, 903 N.E.2d 493, 497 (Ind. Ct. App. 2009). Consequently, the Court will "apply the law that we believe the Supreme Court of [Indiana] would apply if the case were before the tribunal rather than before this [C]ourt." *Help at Home Inc. v. Med. Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001).

Indiana Code § 23-2-1-2(b)(10) provides that the offer or sale of certain securities and transactions are exempt from the registration requirements of the IUSA if four conditions are met. The purpose of this "private placement" exemption is to "permit sales of unregistered securities to investors who are likely to have, or who are likely to obtain, such information as is ordinarily disclosed in registration statements." *S.E.C. v. Guild Films Co.*, 279 F.2d 485, 490 (2d Cir. 1960) (citing *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119 (1953)). Congress determined that, under these circumstances, "there is no practical need for [registration] or . . . the public benefits

are too remote."[6] *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1054 (2d Cir. 1969).  Claiming an exemption is an affirmative defense, and thus the burden is on the issuer, GAB in this instance, to establish that its sale of stock to Supernova fits within the exemption.  IND. CODE § 23-2-1-16(j); *see* STUART R. COHN, 1 SEC. COUNSELING FOR SMALL & EMERGING COS. ("COHN") §§ 6:1, 6:17 ("The issuer is the one who determines and therefore takes the risk as to whether the investor qualifies as an accredited investor.").

The first condition of the exemption is that the issuer must reasonably believe that there is a limited number of purchasers, that is, no more than thirty-five in total or twenty in Indiana. IND. CODE § 23-2-1-2(b)(10)(A).  The second condition is that the issuer must not "offer or sell the securities by means of a form of general advertisement or general solicitation." IND. CODE § 23-2-1-2(b)(10)(B).  The third condition is that the issuer must reasonably believe that "each purchaser of the securities is acquiring the securities for the purchaser's own investment and is aware of any restrictions imposed on transferability and resale of the securities." IND. CODE § 23-2-1-2(b)(10)(C) (explaining that the basis for a "reasonable belief" may include a written representation signed by the purchaser and placement of a legend on the stock certificate).  The parties agree that GAB's sale of its stock to Supernova satisfied these first three conditions.

The dispute, then, centers on whether GAB met the final condition for the exemption. This condition requires, depending on the amount involved, that the issuer furnish an offering statement setting forth certain information and that the securities commissioner, who must be

---

[6] Courts interpreting the IUSA look to federal securities law for guidance. *See, e.g.*, *Ormond v. Anthem, Inc.*, No. 1:05-cv-1908, 2008 WL 906157, at *14 (S.D. Ind. Mar. 31, 2008); *Flynn v. Klineman*, 403 N.E.2d 1117, 1121 (Ind. Ct. App. 1980); *see generally Wesleyan Pension Fund, Inc. v. First Albany Corp.*, 964 F. Supp. 1255, 1270 (S.D. Ind. 1997) (noting that Indiana, like many states, "modeled [its] securities regulations acts on the Uniform Securities Act of 1956").

notified in writing of the terms of the offer, not disallow the exemption. IND. CODE § 23-2-1-2(b)(10)(D), (E), (F). Nevertheless, the issuer is relieved of this fourth requirement if certain other conditions are met—including, if there are no more than fifteen purchasers in Indiana and each Indiana purchaser is an "accredited investor." IND. CODE § 23-2-1-2(b)(10)(G).

GAB admits that it did not furnish an offering statement or notify the securities commissioner of its offer of securities to Supernova. Therefore, as the parties acknowledge, whether GAB is entitled to judgment as a matter of law in its favor on Count I of Supernova's complaint—that is, whether GAB's sale of its stock to Supernova was exempt from registration under Indiana Code § 23-2-1-2(b)(10)—turns solely on whether Supernova is an "accredited investor" as that term is defined in the IUSA.

The IUSA defines "accredited investor" by adopting the definition of that term in Rule 501(a) under Regulation D of the 1933 Securities Act, 17 C.F.R.§ 230.501(a). IND. CODE § 23-2-1-1(r). Rule 501(a) identifies eight "categories" of purchasers who may be "accredited investors," and explains that an "accredited investor" is a person who "comes within any of the . . . categories, or who the issuer reasonably believes comes within any of the . . . categories, at the time of the sale of the securities to that person . . . ." 17 C.F.R. § 230.501(a).

Here, the purchaser, Supernova, was a corporation. A corporation is an "accredited investor" only if it "comes within" one of two categories: (1) if it has "assets . . . of $5,000,000," or (2) if "all" of its equity owners are "accredited investors." 17 C.F.R. § 230.501(a)(3), (8). For an individual to be an "accredited investor," he must meet one of two criteria: (1) have a "net worth" (or joint "net worth" with his spouse) of at least $1,000,000; or (2) have an "annual income" of $200,000 (or $300,000 with his spouse) in each of the two years preceding the sale

and a reasonable expectation of that same income level in the current year. 17 C.F.R. § 230.501(a)(5), (6).

GAB contends that at the time of the transaction, it "reasonably believed" that all of Supernova's shareholders were "accredited investors" based on Supernova's representation and warranty in the Stock Purchase Agreement that it was an "accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act."[7] (Compl. Ex. C ¶ 4.28.) In actuality, however, Roth, the 10% shareholder, did not meet the financial criteria specified in 17 C.F.R. § 230.501(a)(5) or (6) to be an "accredited investor." Supernova suggests that GAB's reliance on its representation and warranty was not enough to provide GAB with a "reasonable belief" that Supernova was an "accredited investor," and that in order for GAB's belief to be "reasonable," GAB needed to rely on other "objective evidence," such as a shareholder financial questionnaire or a review of each shareholder's financial documents.[8] *See* COHN § 6.17.

There is some authority, albeit sparse, to support Supernova's contention. *See*, *e.g.*, *W.-Realco Ltd. P'ship 1983 v. Harrison*, 791 P.2d 1139, 1146 (Co. Ct. App. 1990) ("The reasonableness of a seller's reliance turns on the adequacy of its investigation."); *Anastasi v. Am. Petroleum, Inc.*, 579 F. Supp. 273, 274-75 (D. Co. 1984) (same); COHN § 6.17. Nevertheless, Regulation D "contains no guidelines for determining what issuer measures are necessary to

---

[7] GAB does not argue that Supernova had, or that GAB reasonably believed Supernova had, assets of $5,000,000 at the time of the sale. Indeed, the purchase price for Supernova's subsidiaries was $3,000,000, and Miller told Coran, GAB's attorney, that Supernova had only a few other assets of negligible value. (Miller Aff. ¶¶ 31, 32, Ex. J.)

[8] GAB admits that it did not inquire about Roth's personal financial status, since a representation and warranty about Supernova's "accredited investor" status was included in the Stock Purchase Agreement. (Schmidt Dep. 110-11 ("As to [Roth's] net worth, it never became a topic of discussion, because in the [A]greement here, they state they have a net worth.").)

9

establish reasonable belief." COHN § 6.17.  And, of course, "what is 'reasonable' is always a matter of hindsight." *Id*.

The greater weight of authority supports GAB's assertion that Supernova itself, through its representation and warranty, "provided the [D]efendants with reason to believe that [it was an] accredited investor[] as defined by 17 C.F.R. § 230.501(a)." *Goodwin Props. v. Acadia Grp., Inc.*, No. 01-49, 2001 WL 800064, at *7 (D. Me. July 17, 2011).  Such authority suggests that Supernova "cannot now disavow those representations in order to support [its] claims against the [D]efendants." *Id.*; *see also Wright v. Nat'l Warranty Co., L.P.*, 953 F.2d 256, 260 (6th Cir. 1992) (concluding that plaintiff and his wife could not later disavow their representation and warranty in the subscription agreement that wife was an "accredited investor"); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 532 (S.D. Tex. 2011) (explaining that "non-registration was dependent in part on representations from [p]laintiffs" that they were "accredited investors"); *Pinnacle Commc'ns Int'l, Inc. v. Am. Family Mortg. Corp.*, 417 F. Supp. 2d 1073, 1083 (D. Minn. 2006) (concluding that plaintiff was "estopped" from claiming that it was not an "accredited investor" after "it affirmed in writing, at the time that the subscriptions were entered into, that it did qualify"); *Faye L. Roth Revocable Trust v. UBS Painewebber, Inc.*, 323 F. Supp. 2d 1279, 1301 (S.D. Fla. Mar. 30, 2004) (holding that plaintiffs could not disavow their representations that they were an "'accredited investor' under Regulation D").

Consistent with this authority, the Court, when considering the particular circumstances of the transaction at issue, concludes that GAB, as a matter of law, "reasonably believed" Supernova was an "accredited investor."  The parties here were engaged in the purchase and sale of Supernova's business.  This required several months of negotiation, and both parties were

represented by counsel. Indiana courts recognize a "very strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties." *Ransburg v. Richards*, 770 N.E.2d 393, 395 (Ind. Ct. App. 2002) (citations omitted).

As part of this sophisticated transaction, Supernova performed due diligence on GAB and readily admits that the parties had "extensive exchanges of information." (Miller Aff. ¶¶ 12, 13.) In fact, ultimately, it was Supernova, not GAB, who chose to structure the transaction as a purchase and sale of stock, rather than assets. Furthermore, there is no indication that Harnish and Miller, who directed the transaction for Supernova and signed the Stock Purchase Agreement on its behalf, gave GAB any reason to know or suspect that Supernova was not an "accredited investor" through the financial worth of its shareholders. *See* COHN § 6.17.

In fact, Harnish and Miller and his wife apparently were all "accredited investors," as Supernova does not suggest otherwise. *See generally Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (emphasizing that summary judgment "is the 'put up or shut up' moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events" (citations omitted)). Thus, only 10% of Supernova's shareholders did not, in actuality, satisfy the "accredited investor" criteria. *See Wright*, 953 F.2d at 260-61 (finding any failure to comply with Rule 501(a) of Regulation D with respect to "accredited investor" status of investor's wife was "harmless error within the meaning of 17 C.F.R. [§] 230.508(a)").

Moreover, at the end of the day, Supernova's claim against GAB for the sale of unregistered securities is hard to square with Supernova's *own* sale of the unregistered stock of its subsidiaries to GAB *in the same transaction*. The Stock Purchase Agreement is devoid of

any representations or warranties about GAB's status as an "accredited investor," or, for that matter, any other securities-related matters concerning Supernova's sale of the stock to GAB. Accordingly, GAB's contention—that "[i]f anybody has a claim for violation [o]f the IUSA, it is probably GAB" (Defs.' Br. in Supp. 14)—is not without some persuasive merit from a policy perspective.

In sum, under the particular circumstances of the transaction at issue, Supernova's representation and warranty that it was an "accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act" was sufficient to cause GAB to "reasonably believe" that Supernova was an "accredited investor." Accordingly, the sale of its stock to Supernova pursuant to the Stock Purchase Agreement was, as a matter of law, exempt under Indiana Code § 23-2-1-2 (b)(10) from the registration requirements of the IUSA. Therefore, GAB's motion for partial summary judgment as to Count I of its complaint will be GRANTED.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment (Docket # 53) is GRANTED and, accordingly, Count I of the Amended Complaint, Violation of the Act's Registration's Requirements, is dismissed. Count II, Violation of the Anti-Fraud Provision of the Act, however, remains for trial.

**The Court sets this matter for a telephonic scheduling conference on February 23,**

**2012, at 10:00 a.m., for the purpose of setting a three-day bench trial and a final pretrial conference.**

SO ORDERED.

Enter for the 9th day of February, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
