UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| SUPERNOVA SYSTEMS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:10cv319 |
| | ) |
| GREAT AMERICAN BROADBAND, INC., | ) |
| ROBERT L. SCHMIDT, and | ) |
| SUBODH NAYAR, | ) |
| | ) |
| Defendants. | ) |

SECOND AMENDED COMPLAINT

Comes now Supernova Systems, Inc., Plaintiff, and for its claims against Great American Broadband, Inc., Robert L. Schmidt, and Subodh Nayar, Defendants, alleges:

Jurisdiction

1. The Court has jurisdiction over this action and the parties hereto based on 28 U.S.C. §1332, in that:

   a. The Plaintiff, Supernova Systems, Inc., (herein "SSI") is a corporation originally and continuously formed under the laws of the State of Indiana and having at all times its sole and principle place of business in the State of Indiana.

   b. The Defendant, Great American Broadband, Inc., (herein "GAB") is a corporation originally and continuously formed under the laws of the State of Delaware and having at all times its principle place of business in the State of Maryland and/or in the District of Columbia.

   c. The individual Defendants are and at all relevant times were citizens and residents of the State of Maryland and/or of the District of Columbia.

        d.      The amount in controversy, exclusive of costs and interests, in excess of $75,000.00.

## COUNT I
## CLAIM UNDER INDIANA SECURITIES ACT

A.    Background Facts

2.    GAB is a corporation formed in May 2007 under the laws of the State of Delaware.

3.    GAB was formed for the purpose of becoming a provider of broadband based internet service access as an Internet Service Provider ("ISP").

4.    At its formation, GAB had no initial ISP activities and no customers for ISP services.

5.    The business plan of GAB was to become an ISP by acquiring existing businesses which provided internet service to rural, smaller communities and other areas which it deemed to be underserved by other ISPs.

6.    SSI is and at all relevant times was an Indiana corporation having its principle place of business in Wells County, Indiana.

7.    SSI was a business which provided internet access services, as well as related services, in the State of Indiana, to rural, small towns and similar areas largely in Indiana. SSI provided such services through a series of Indiana corporate entities which were its wholly owned subsidiaries (herein "Subsidiaries").

8.    SSI's wholly owned Subsidiaries included: OnlyInternet Broadband & Wireless Inc., OnlyInternet, Inc., Progressive Internet Services, Inc., NameMyDots.Com, Inc., and Supernova Technologies, Inc. (again, herein collectively the "Subsidiaries").

9. Each of the individual Defendants herein is and at all relevant times was (A) an officer of GAB, (B) a director of GAB, and (C) a person having direct or indirect control over GAB.

10. In summer and early fall of 2007, GAB initiated contact with SSI to explore the possibility of GAB acquiring SSI and/or the internet provider and related business of SSI.

11. In October 2007, GAB executed and issued a form of Letter of Intent to SSI and to shareholders of SSI, which was accepted.

12. The October 2007 Letter of Intent proposed a transaction in which GAB would acquire all of the issued and outstanding shares of SSI from the then existing shareholders of SSI. A copy of this Letter of Intent is attached hereto as Exhibit A.

13. In November 2007, following further exchanges between GAB and SSI, GAB executed and issued a second Letter of Intent. SSI accepted this Letter of Intent. A copy of the November Letter of Intent is attached hereto as Exhibit B.

14. The November 2007 Letter of Intent proposed a transaction in which GAB would acquire from SSI all of the issued and outstanding shares of the Subsidiaries of SSI.

15. In connection with the accepted November 2007 Letter of Intent, GAB paid certain sums as earnest money and/or as advancements to SSI.

16. The November 2007 Letter of Intent proposed that GAB would pay, in consideration of the conveyance by SSI of all the shares of its Subsidiaries identified in Paragraph 4 above, the sum of $3,000,000.00.

17. The November 2007 Letter of Intent provided that the said sum of $3,000,000.00 would be paid to SSI as follows:

    a. Cash prior to or at closing in the aggregate sum of $250,000.00.

    b. A one-year Promissory Note in the amount of $600,000.00, payable in four quarterly installments.

    c. The balance of the prior to be paid by GAB issuing shares of its common stock to SSI.

  18. On or about July 10, 2008, GAB and SSI entered into a formal Contract to convey into effect the terms of the November 2007 Letter of Intent. A copy of this Contract is attached here as Exhibit C.

  19. The Contract, Exhibit C hereto, consistent with the November 2007 Letter of Intent, valued the issued shares of the Subsidiaries at $3,000,000.00 and provided that SSI would transfer all of the shares of the Subsidiaries to GAB.

  20. The Contract, Exhibit C, provided that GAB would pay the $3,000,000.00 in three ways:

    a. A payment of cash upon closing in an amount which, when added to the earlier cash payments made by GAB to SSI, would total $250,000.00.

    b. Delivery of a Promissory Note in the amount of $600,000.00 payable in four quarterly installments.

    c. Issuance to SSI of 53,300 shares of the common stock of SSI, valued at $2,150,000.00.

  21. The transaction described in the Contract was executed on or about July 10, 2008. The 53,300 shares of GAB stock were issued and delivered to SSI. Likewise, the issued outstanding shares of the Subsidiaries were delivered to GAB.

B. <u>Application of the Act to the Transaction</u>

  22. The Indiana Securities Act ("the Act"), I.C. 23-2-1-1 et. seq. (now I.C. 23-19-1-1 et. seq.) regulates both the "offer" and the "sale" of any "securities" made in Indiana. Further,

the Act makes provisions for a purchaser of securities to bring a civil action against the "seller" of the securities, and also against certain others (e.g. officers, directors and control persons of the seller) whenever the offer or the sale of the securities was made "in violation of any provision of the Act." See I.C. 23-2-1-19 (now I.C. 23-19-5-9).

23. The Letters of Intent, Exhibits A and B hereto, and the precedent oral communications made to SSI constituted "offers" to sell shares of GAB common stock to SSI, which shares were a "security" as deferred in the Act at I.C. 23-2-1-1 (now I.C. 23-19-1-2). Such offers were made to SSI in Indiana.

24. The Contract, Exhibit C, and the consummation of the transaction there under constituted a "sale" or a "selling" of the GAB common stock to SSI as defined under the Act at I.C. 23-2-1-1 (now I.C. 23-19-1-2).

25. The sale of the GAB stock was made in Indiana because (1) the GAB stock was delivered to SSI in Indiana, (2) the Contract, Exhibit C, expressly makes Indiana law applicable to the transaction, and (3) SSI and all of the Subsidiaries of SSI whose stock was conveyed to GAB were incorporated in Indiana, and both SSI and its Subsidiaries had their principle locations and all or substantially all of their business operations in Indiana.

C.   Violation of the Act's Registration Requirements

26. The share of GAB common stock which were offered and sold to SSI was not registered under the Indiana Securities Act.

27. Both the offer and the subsequent sale of the GAB common stock were made to SSI in violation of the registration requirements of the Indiana Act, specifically I.C. 23-2-1-3 (now I.C. 23-19-3-1).

28. SSI did not have, at the time of the offer or sale of the GAB common stock to SSI, knowledge that such offer or said sale was being made in violation of the Act.

D.   Violation of the Anti-Fraud Provision of the Act

29.   The Act provides, in I.C. 23-2-1-12(2) (now I.C. 23-19-5-1(2)) makes it a violation of the Act for any person, in connection with an offer or a sale of any security,

> "to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

30.   As indicated above, of the $3,000,000.00 value of the Subsidiaries of SSI which GAB was to pay in the transaction, some $2,150,000.00 was to be paid by and attributed to the GAB common stock which GAB was to issue and deliver to SSI. That represented in excess of 66% of the value which SSI was to receive.

31.   In oral communications to SSI and in each of the Letters of Intent, Exhibits A and B hereto, GAB represented to SSI that GAB had and/or upon consummation of the transaction would have had a valuation of $17,000,000.00 to $20,000,000.00. That representation formed, in turn, the basis upon which it was determined that the value of the GAB 53,300 shares would represent a value equivalent to the $2,150,000.00 portion of the price for the stock of SSI's Subsidiaries.

32.   Though requested to do so, GAB did not provide to SSI any form of a GAB financial statement to demonstrate that GAB had or would, post transaction, have a valuation of $17,000,000.00 to $20,000,000.00.

33.   In addition, in connection with the offer and the sale of the GAB common stock to SSI, GAB presented to SSI its "Business Plan" to acquire existing ISP businesses and represented that GAB had the financial recourses necessary to implement its "Business Plan."

34.   Both before issuance of the Letters of Intent, and continuing through the execution of the Contract (Exhibits A, B and C hereto), GAB repeatedly represented and assured SSI that it, GAB, was a well financed, solid business, having financial recourses sufficient to

6

execute its "Business Plan" and to justify and support its representations as to GAB's having a valuation of $17,000,000.00 to $20,000,000.00.

35. The above referenced representations were untrue statements of fact which were material to SSI's entering into the Letters of Intent and into the Contract and material to SSI's decision to consummate the transaction with GAB.

36. In fact, GAB was a recently formed entity which did not have a pre- or post-transaction "valuation" of $17,000,000.00 to $20,000,000.00. GAB further lacked financial resources to effectuate its "Business Plan".

37. In addition to the foregoing, GAB omitted to disclose to SSI material facts relevant to and necessary to render its representation that GAB had or would have "a valuation" of $17,000,000.00 to $20,000,000.00, not misleading in that, upon information and belief:

    a. GAB had substantial debts and obligations to third parties upon loans such third parties had made to GAB, and which loans were not taken properly into account in making the representation that GAB had or would have a "valuation" of $17,000,000.00 to $20,000,000.00.

    b. GAB was so lacking in financial resources itself that GAB had to borrow funds to pay for certain "Leases" it acquired in a public auction.

    c. GAB lacked financial resources to repay loans it had received from third parties when such loans fell due or were called by the lenders.

38. During the period between July 1, 2007 and the closing of the transaction between GAB and SSI, GAB on July 10, 2008, repeatedly represented that GAB was a financially sound business, having assets and funds sufficient to allow GAB to establish, grow and expand its business and had a valuation between $17 Million and $20 Million.

39. During the discussions between SSI and GAB, upon inquiry from SSI, GAB represented that the only issued and outstanding shares of GAB stock were "founder's shares" issued to Mr. Schmidt.

40. To bolster its status as a well financial business capable of executing its business plan, GAB repeatedly represented to SSI that GAB was engaged in discussion with a wealthy Pakistani businessman, Iftikhar Shirazi, who was contemplating an investment of $1,000,000.00 in cash to purchase stock in GAB. Shortly before the closing of GAB's transaction with SSI, GAB informed SSI that Mr. Shirazi had made his $1,000,000.00 investment in GAB stock.

41. The representations set out in Paragraph 38 above were false and/or misleading due to GAB's omission to disclose to SSI that:

    a. GAB had few material assets prior to July 10, 2008.

    b. GAB was financially surviving on "bridge loans" that were being made to GAB by Mr. Schmidt and/or members of GAB's "Advisory Board".

    c. GAB lacked cash resources to fund its pending acquisitions without the proceeds from Mr. Shirazi's $1 Million investment.

42. The representation set forth in Paragraph 39 above was false and/or misleading due to GAB's omission to disclose to SSI that:

    a. The "founder's shares" held by Mr. Schmidt represented substantial voting control of GAB and had been acquired in exchange for or to satisfy "bridge loans" he made to GAB, and at an imputed per share price of less than $1.00 per share.

    b. GAB had issued and sold shares of GAB common stock to individuals and companies during the period from May 2007 and up to shortly before July 10, 2008 (date of closing of GAB's transaction with SSI.) These shares had been issued and sold to employees of GAB (including GAB's Chief Financial Officer) and to various members of GAB's "Advisory

Board" at prices substantially less than the $40.00 imputed price SSI would pay for its shares of GAB stock. The prices paid for GAB stock by GAB employees and Advisory Board members ranged from less than $4.00 to approximately $23.00 per share.

43. GAB's representation set out in Paragraph 40 above concerning Mr. Shirazi's $1,000,000.00 cash investment in GAB stock was false and/or misleading due to GAB's omission to disclose material facts about that matter. These omissions to disclose facts about GAB's transaction with Mr. Shirazi included the omissions to disclose to SSI the following, amongst other matters:

    a. Mr. Shirazi did not himself invest $1,000,000.00 to purchase stock in GAB.

    b. In late May 2008, Pearl Capital Holdings, LLC, an entity in which Mr. Shirazi was interested, loaned $1,000,000.00 to GAB under the terms of a Loan Agreement.

    c. Pearl Capital Holdings, LLC's "loan" to GAB was reflected in a five (5) year Convertible Note which would automatically convert to GAB stock if, but only if, Mr. Shirazi obtained a special form of visa from the Department of Homeland Security.

    d. In the Loan Agreement, GAB represented to Pearl Capital Holdings, LLC that GAB had no issued or outstanding GAB stock, which representation was false.

    e. In the Loan Agreement, GAB represented to Pearl Capital Holdings, LLC that, as of the date of the agreement, May 28, 2008, GAB had a value of $30,000,000.00. This representation was 50% greater than GAB's representation to SSI that GAB had a valuation of $20,000,000.00 which GAB made to SSI consistently from at least October 2007 through July 10, 2008.

    f. Pearl Capital Holdings, LLC's "loan" to GAB was secured by an interest in a life insurance policy on Mr. Schmidt and a "pledge" by GAB of 15,000 shares of GAB stock.

    g. The Loan Agreement provided that sums owed to it under the Loan Agreement to Pearl Capital Holdings, LLC would have a preference over other shares issued GAB shares in the event of any liquation and/or bankruptcy or similar action involving GAB. In short, Pearl Capital Holdings, LLC would, in such events prior to conversion, receive back its $1,000,000.00 preferentially and ahead of other creditors of GAB.

    h. The Loan Agreement provided that in the event that GAB's valuation, on the date the "loan" converted to GAB stock was less than the represented $30,000,000.00, the number of GAB shares to be issued to Pearl Capital Holdings, LLC would be increased to assure that the issued shares had a value equivalent to $1,000,000.00, plus accrued interest, based on GAB's valuation at the time of the conversion.

    The effect of the provision in the Loan Agreement was to provide Pearl Capital Holdings, LLC with (i) an assured 50% increase in the number of shares to be issued to Pearl Capital Holdings, LLC if the valuation of GAB on the conversion date was $20 Million, and (b) built in protection from the risk that GAB's valuation might decline prior to the loan converting to stock.

    When the "loan" did convert to GAB stock, Pearl Capital Holdings, LLC in 2011 was issued approximately 25% of the total outstanding shares of GAB (since GAB's valuation had shrank to approximately $4,000,000.00) rather than the 3.0% Pearl Capital Holdings, LLC would have received if the valuation of GAB on the conversion date had been or had remained the $30,000,000.00 represented in the Loan Agreement.

      i.      The Pearl Capital Holdings, LLC "loan" to GAB was not promptly funded.

      j.      GAB was required to enter into an Employment Agreement with Mr. Shirazi to pay him $60,000.00 per year, plus fringe benefits, as a condition of the Pearl Capital Holdings, LLC loan.

44.      SSI did not have, at the time of the transaction, knowledge that the GAB common stock was being offered and/or sold to SSI in violation of I.C. 23-2-1-12(2) or of the falsity of the representation and/or of the omitted facts set forth above in Paragraphs 38 through 43. The facts misrepresented and not disclosed to Supernova were material facts.

E.      <u>The Individual Defendants</u>

45.      Based upon the foregoing facts, GAB is legally liable to SSI pursuant to the express and liability provisions of the Act, specifically I.C. 23-2-1-19(a) (now I.C. 23-19-5-9(a)).

46.      The individual Defendants, named above, were at the times of the offer and of the sale of the GAB common stock (1) officers of GAB, (2) directors of GAB, or (3) persons with control over GAB, and hence are liable to SSI pursuant to I.C. 23-2-1-19(d) (now I.C. 23-19-5-9(d)).

F.      <u>Remedy Sought</u>

47.      On or immediately after July 10, 2008, GAB took control of the Subsidiaries and their business operations. GAB has continuously operated the Subsidiaries' businesses since that time. Accordingly, SSI is not presently aware of whether GAB has the capacity to return the Subsidiaries' businesses without material alteration to them by returning to SSI all of the stock of the Subsidiaries which SSI transferred to GAB.

48.      Based on all of the foregoing, SSI is entitled to rescission of the transaction effectuated between GAB and SSI, including the return to SSI of the stock of the Subsidiaries,

with such adjustments as may be required in light of GAB's management and operation of the Subsidiaries since July 10, 2008.

49. If rescission is not possible or practical, then SSI is entitled to an award of damages measured in accordance with the formula set out in I.C. 23-2-1-19(a)(d) (now I.C. 23-19-5-9), to include an appropriate credit to GAB for the amounts of each payment which GAB made to SSI.

50. SSI has possession of the Promissory Note of GAB, upon which GAB had made no payments. SSI also has possession of the 53,300 shares of GAB common stock. SSI is ready, willing and able to tender and does now tender the Note and GAB stock to such of the Defendants named herein.

51. SSI is entitled to interest and reasonable attorney fees in accordance with I.C. 23-2-1-19(a)(d) (now I.C. 23-19-5-9).

WHEREFORE, SSI prays judgment be entered in its favor and against each of the within named Defendants, jointly and severally.

COUNT II
CLAIM FOR COMMON LAW FRAUD

52. This Count II claim is asserted solely against GAB and Mr. Schmidt.

53. SSI here incorporates Paragraphs 2 through 21 above; Paragraph 25 above; Paragraphs 30 through 53 above.

54. The untruth representation made to SSI, as set forth in the incorporated paragraphs identified in Paragraph 55 above, were made with intent to deceive SSI and/or in reckless disregard of the truth or falsity of such representation, and/or were rendered false or misleading by virtue of the intentional and/or reckless failure to disclose material facts which were known to GAB and to Mr. Schmidt, but which were unknown to SSI.

55. SSI reasonably relied upon the representation made to it by GAB and Mr. Schmidt in entering into the Contract and affecting the sale of the stock of its subsidiaries to GAB.

56. SSI was damaged as a proximate result of its reliance on the false and misleading representation of GAB and Mr. Schmidt in that it was led to exchange the stock of its various subsidiaries for shares of GAB which had, in truth, little or no value.

WHEREFORE, SSI prays the Court for relief, in the alternative, as follows:

i. For rescission of the transaction between GAB and SSI, return of the ownership of the subsidiaries, together with such amounts as may be determined to be necessary to adjust for and/or to compensate SSI for the diminution of the value of its subsidiary assets;

<u>or</u>

ii. For damages proximately resulting to SSI, in the event rescission is not an available remedy.

COUNT III
CLAIM ON PROMISSORY NOTE

57. This Count III claim is asserted solely against GAB. Further, this claim is asserted as an alternative claim for relief if and in the event that SSI does not achieve an effective remedy of rescission under Counts I or II above.

58. In connection with the parties' Contract, GAB executed and delivered to SSI a Promissory Note in the principle amount of $600,000.00, a copy of which is attached hereto as Exhibit D.

59. GAB failed to make payments on the Promissory Note in accordance with its terms and GAB failed to cure such default within ten (10) days after GAB was given written notice of such default by SSI.

60. Consequently, the whole of the face amount of said Promissory Note became and remains wholly owing to SSI, with interest as stated in said Note.

61. In addition, the said Note provides for SSI to recover reasonable attorney fees and costs if SSI prevails in this action on this Count III claim.

WHEREFORE, SSI prays for judgment against GAB in the principle sum of $600,000.00, plus 5% interest and reasonable attorney fees and costs.

Respectfully submitted,

**EILBACHER FLETCHER, LLP**

/s/Martin T. Fletcher, Sr.
Martin T. Fletcher, Sr. #6908-02
David E. Bailey #21527-02
803 S. Calhoun Street, Suite 400
Fort Wayne, Indiana 46802
Telephone:  (260) 425-9177
Facsimile:  (260) 424-9177
Counsel for the Plaintiff

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the above and foregoing document was served this _____ day of February, 2012, via the CM/ECF electronic filing system upon all counsel of record.

/s/Martin T. Fletcher, Sr.
Martin T. Fletcher, Sr.